IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MICHELLE DEYOUNKS,
      Plaintiff,

v.                                Case No. 4:18cv543-RH-EMT

ANDREW SAUL, Commissioner of
Social Security,[1]
      Defendant.
_____/

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b) and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act"). The case is now before the court pursuant to 42 U.S.C. § 405(g) for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Michelle Deyounk's application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83. Upon review of the record before the court, I conclude the findings of fact and determinations of the Commissioner are supported by substantial evidence and

---

[1] Andrew Saul is now the Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), he is automatically substituted for Acting Commissioner Nancy A. Berryhill as Defendant in this suit. The clerk is directed to update the docket accordingly.

application of proper legal standards and that the Commissioner's decision, therefore, should be affirmed.

## ISSUES ON REVIEW

Ms. Deyounks raises three issues on appeal, arguing the ALJ erred in (1) finding she did not suffer from a several mental impairment; (2) failing to consider the effect of non-severe impairments on her residual functional capacity ("RFC"); and (3) relying on the opinion of a state agency medical consultant without addressing medical evidence of which the consultant was unaware at the time he rendered the opinion (ECF No. 14 at 1–3).

## PROCEDURAL HISTORY

Ms. Deyounks filed an application for SSI on March 16, 2015, alleging disability beginning July 1, 2013 (t. 121, 241–50).[2]  Her claim was denied initially and on reconsideration (t. 120–35).  Ms. Deyounks appeared for hearings before an Administrative Law Judge ("ALJ") on April 18, 2017, and December 13, 2017 (t. 43–107).  On January 19, 2018, the ALJ issued a decision denying Ms. Deyounks' application for SSI (t. 12–36).  Ms. Deyounks petitioned the Appeals Council for review of the ALJ's decision (t. 7–9).  The Appeals Council denied the request (t.

---

[2] The administrative record, as filed by the Commissioner, consists of fifteen volumes (ECF Nos. 10-1 through 10-15) and has 782 consecutively numbered pages.  References to the record will be by "t.," for transcript, followed by the page number.

1–5).  The ALJ's decision thus became the final determination of the Commissioner.
That determination is now ripe for review.

## FINDINGS OF THE ALJ

In her written decision, the ALJ made a number of findings relevant to the
issues raised in this appeal:

- Ms. Deyounks has not engaged in substantial gainful activity since
  March 16, 2015, the application date (t. 17).

- Ms. Deyounks has the following severe impairments: morbid obesity;
  osteoarthritis; cervicalgia (neck pain); degenerative disc disease (with
  associated arthritis); and spondylosis with radiculopathy, lumbar region
  (*id.*).[3]

- Ms. Deyounks does not have an impairment or combination of
  impairments that meets or medically equals the severity of one of the
  listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20
  CFR §§ 416.920(d), 416.925, and 416.926) (t. 20).

- Ms. Deyounks has the RFC to perform light work, as defined in 20
  C.F.R. § 416.967(b), except she can sit up to six hours in an eight-hour

---

[3] The ALJ found the following non-severe impairments: iron deficiency; insomnia; Vitamin D
deficiency; hearing loss; tinnitus; hypermobility; carpal tunnel syndrome; major depression
disorder ("MDD"); and general anxiety disorder ("GAD") (t. 17–18).  The ALJ also found Ms.
Deyounks has a non-medically determinable impairment of fibromyalgia (t. 20).

day and up to two hours at a time without interruption; she can stand and walk for up to three hours each in an eight-hour day and up to one hour at a time without interruption; she can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl; she should avoid concentrated exposure to workplace hazards, such as unprotected heights and dangerous moving machinery; she can frequently reach over to the right and left; and she can occasionally tolerate exposure to vibration (t. 21).

• Ms. Deyounks is capable of performing her past relevant work as a night auditor and desk clerk, which do not require the performance of work-related activities precluded by her RFC (t. 34).

• Considering Ms. Deyounks' age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that she can perform (t. 35).

• Ms. Deyounks has not been under a disability, as defined in the Act, since March 16, 2015, the date she filed her application (t. 36).

## STANDARD OF REVIEW

A federal court reviews the "Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." *Lewis v.*

*Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (*quoting Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986).

When reviewing a Social Security disability case, the court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)); *see also Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015) ("In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings.") (*citing Black Diamond Coal Min. Co. v. Dir., OWCP*, 95 F.3d 1079, 1082 (11th Cir. 1996)). A reviewing court also may not look

"only to those parts of the record which support the ALJ" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). Review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record." *Flynn v. Heckler*, 768 F.2d 1273 (11th Cir. 1985).[4]

The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the claimant not only is unable to do her previous work "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A). To be eligible for disability benefits, a claimant must prove she became disabled prior to the expiration of the date last insured. *See* 42 U.S.C. §§ 416(i)(3), 423(a) and (c);

---

[4] The Eleventh Circuit not only speaks of an independent review of the administrative record, but it also reminds us that it conducts a *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

20 C.F.R. §§ 404.101, 404.130, 404.131; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Pursuant to 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the Commissioner analyzes a disability claim in five steps:

1.  If the claimant is performing substantial gainful activity, she is not disabled.

2.  If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from performing past relevant work, she is not disabled.[5]

---

[5] The claimant bears the burden of establishing a severe impairment that keeps her from performing past relevant work.  20 C.F.R. § 404.1512; *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

5. Even if the claimant's impairments prevent her from performing past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's RFC and vocational factors, she is not disabled.[6]

At step five (or step four in cases in which the ALJ decides a claimant can perform past work), the ALJ formulates RFC through interpretation of the medical evidence and the claimant's subjective complaints, based on the impairments identified at step two. *See* 20. C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). RFC is then used by the ALJ to make the ultimate vocational determination required by step five.

## FACTUAL BACKGROUND[7]

In her application, Ms. Deyounks alleged disability due to major depression, anxiety, fibromyalgia, degenerative arthritis, chronic fatigue, sleep disorder, hypermobility, urinary incontinence, irritable bowel syndrome, and iron deficiency

---

[6] If the claimant meets her burden at step four, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).

[7] The recitation of facts set forth below is derived from Ms. Deyounks' testimony at the initial hearing before the ALJ and the administrative record. The second hearing, which was requested by Ms. Deyounks' counsel, lasted for only seven minutes and appears to have been for the narrow purpose of establishing there had been no improvement in Ms. Deyounks' conditions since the initial hearing and that Ms. Deyounks never held a job that permitted her to sit for extended periods of time, neither of which has any bearing on the issues raised in this appeal (*see* t. 45–49).

(t. 125, 288). She was forty-seven years old on the date of alleged onset and fifty-one years old on the date of the ALJ's decision (t. 36, 273). At the time of her initial hearing, Ms. Deyounks weighed 238 pounds and stood at five feet, two inches tall (t. 54–55). She was separated from her husband, having filed for divorce, and she lived alone with her nine-year old son in a single-family dwelling for which she paid no rent (t. 55–56).[8] She supported herself and her son with food stamps and assistance from her mother (*id.*). She had a driver's license and drove her son to school and to the grocery store (t. 58). She also had a GED and certified nursing assistant ("CNA") license (*id.*).[9]

Ms. Deyounks held a number of jobs before quitting work in 2008. From September 1997 to May 2002, she worked as a front desk receptionist in the administrative office of the North Florida Fair Grounds (t. 64). She answered the telephone, typed letters, and assisted with accounts receivable and payable (*id.*). During the eleven days of the annual fair, she also assisted with human resources, such as screening and hiring employees; ran errands on the fairgrounds; helped get things ready for the fair; and served as the "hub of communication between the

---

[8] While Ms. Deyounks' husband was still living in the home, he did maintenance jobs for the property owner when needed, in exchange for which the owner agreed not to charge rent (t. 56). After Ms. Deyounks' husband moved out of the home, the landlord allowed Ms. Deyounks and her son to continue living in the home rent-free (*id.*).

[9] After passing the state boards to begin her career as a CNA, Ms. Deyounks learned she would have to work in a nursing home before being able to work in a hospital (*id.*). She had no desire to work in a nursing home, so she chose not to pursue a career as a CNA (*id.*).

administration, the carnival people, and the Leon County Sheriff's Department" (*id.*).  Ms. Deyounks left the Fair Grounds job when she was terminated upon return from sick leave after having gallbladder surgery (t. 65).  While working at the Fair Grounds, Ms. Deyounks also assisted her now ex-husband with his vending machine business (t. 66).  She helped fill vending machines, took care of inventory, helped bring in stock, counted money and prepared deposits, and handled all paperwork, including state sales tax and corporate paperwork (*id.*).

After being terminated from the Fair Grounds job, Ms. Deyounks collected unemployment compensation for approximately one year before going to work in 2003 as a front desk clerk, night auditor, and ultimately assistant manager at a hotel/motel (t. 61–62, 65–66).  As the front desk clerk, Ms. Deyounks "[r]an the front desk" (t. 62).  As night auditor, she performed nightly auditing duties and also ran guest services, "where[by,] if guests in the rooms needed anything, [she] would have to run it to their rooms and things like that" (*id.*).  She left the hotel/motel job in 2005, after approximately a year and a half, because she "was not getting along with the new management, and with the new ownership," at least in part because they required employees to wear makeup, which she refused to do because it "breaks [her] out" (t. 62–63).

From some time in 2005 until March 1, 2007, Ms. Deyounks worked for a dry-cleaning business (t. 60).  She took in clothes, waited on customers, helped bag

clothes, and prepared deposits—"just about everything but the actual dry cleaning and ironing" (*id.*).  She left the dry-cleaning job and went to work for a cleaning company, "cleaning up classrooms and stuff" at a school (t. 60–61).  She remained at that job for only a few months before returning to the dry-cleaning business (t. 61).  After becoming pregnant, Ms. Deyounks quit the dry-cleaning job upon the advice of her doctors, who said she should not work there because of the chemicals (t. 60).

From March 2007 until early 2008, Ms. Deyounks worked in a church nursery (t. 59).  She left the nursery after her son was born "because it was interfering too much with . . . taking care of [her] son" (*id.*).  "[I]t was just too much of a toll on [her] to be able to get up in the morning, and get to the church.  And, there were nights where [she] was up all night with him.  So, [she] just chose that it was best that [she] would just leave that, and tend to [her] son" (t. 63).  The nursery job appears to be the last job Ms. Deyounks held.

With regard to her daily routine, Ms. Deyounks testified that when she wakes up in the morning, she gets her son up and gets him ready for school (t. 74).  She "[g]et[s] his lunch, and things ready, and . . . take[s] him to school" (*id.*).  She then returns home (*id.*).  Depending on how she feels that morning, she "sometimes . . . start[s] cleaning" (*id.*).  She "may start cleaning, or [she] may sit down in a chair"

(*id.*).  "And, [she] may sit there for a little while until [the] pain eases up, or [she] may fall asleep in the chair for three to four hours" (t. 74–75).

She picks her son up from school at 3:00 p.m. and "go[es] home, and help[s] him with his homework, and the things he needs to do" (t. 75).  She also makes dinner and gets her son ready for bed (*id.*).  Ms. Deyounks testified she has no problem caring for her son, who she described as "pretty self-sufficient" (t. 77).  She explained "it's just a matter of just washing his clothes, and making sure he has his stuff, everything he needs to be able to go to school.  And, what he needs to get by every day" (*id.*).

Ms. Deyounks quit smoking less than six months before the hearing, having smoked "[t]wo packs a day for the last 36 years" (t. 73).  She last smoked marijuana, daily, approximately one year before the hearing; "[a]nything harder than that would have been over 25 years ago," when she was "young and dumb" and used cocaine and methamphetamine, including intravenously (t. 73–74, 512).  She no longer drinks alcohol (t. 73).

Ms. Deyounks last saw her primary care physician one month before the hearing (t. 69).  She also was seeing a neurologist "[f]or . . . arthritis, fibromyalgia, all of that" and a hematologist for iron deficiency (*id.*).  She was taking approximately ten medications a day and another two as needed for pain and muscle

relaxation (t. 70). The only side effect from the medications was that they made her "sleepy" (*id.*).

The ALJ asked Ms. Deyounks the reason she feels she no longer can work (t. 68). Ms. Deyounks responded that she is "unable to sit, stand, or walk for any long periods of time" and "tire[s] out real easily" (*id.*). She then proceeded to address her alleged mental impairments. When asked about depression, Ms. Deyounks said she has "dealt with [depression] for many, many years" and is "not sure why" (t. 75.). "A lot of things have happened in [her] life, stemming from . . . childhood" (*id.*). At age eleven, her twenty-one-year-old brother was killed in a car accident (*id.*). Doctors have opined she suffers from post-traumatic stress disorder as a result of the tragedy—at least in part because she panics if she does not know the whereabouts of her son (*id.*). When her son is around, however, she does "pretty well" (t. at 76). "It's when he's out of [her] sight" that she is uncomfortable; she thus confirms his whereabouts throughout the day (*id.*).

Ms. Deyounks testified she goes through cycles of depression (t. 84–85). She said "[i]t depends on the situations I'm going through, and what's going on in my life at the time" (t. 85). "I have a tendency if I'm stressed, I'm not somebody who how do I say, talks well with others about my personal problems that's going on. I tend to keep it to myself, and because of it, I bottle things up inside until I explode" (*id.*). She explained "[s]omebody will trigger me finally to where I just go off, and

that's the person who's going to get the brunt of everything that I've been holding inside" (*id.*).

Ms. Deyounks' counsel referenced Ms. Deyounks' visit with Mark Reeves, Ph.D., a state agency consultant who performed a consultative psychological evaluation in connection with Ms. Deyounks' claim (*id.*). Counsel also referred to Dr. Reeves' diagnosis of "moderate to severe depression and anxiety" and assignment of a GAF score of 50[10] (t. 86). Counsel then asked Ms. Deyounks about the severity of her depression at the time of the hearing in comparison to the day she saw Dr. Reeves (*id.*). Ms. Deyounks responded, "[r]elevant to back then, it's not quite as bad at that time. That was the first time that me and my husband had separated" (*id.*).

Jayne Elizabeth Jerrell, a vocational expert, also testified at the hearing (t. 91). Ms. Jerrell identified Ms. Deyounks' past work as small business owner, which is

---

[10] A Global Assessment of Functioning, or GAF, rating has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within the range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. The American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("DSM-IV-TR") 34  (4th ed., text rev., 2000). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* The most recent edition of the Diagnostic and Statistical Manual no longer recommends use of the GAF scale, acknowledging "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity and questionable psychometrics in routine practice." American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 16 (5th ed. 2013).

light and skilled; assistant manager, which is sedentary and skilled; night auditor, which is sedentary and skilled; desk clerk, which is light and semi-skilled; receptionist/clerical, which is sedentary and semi-skilled; bookkeeper, which is sedentary and skilled; maid, which is light and unskilled; laundry clerk, which is light and semi-skilled; and daycare worker, which is light and semi-skilled (t. 91–94). The ALJ asked Ms. Jerrell to assume a hypothetical individual of Ms. Deyounks' age, education, and work experience who had the RFC to perform less than the full range of *light* work except for lifting twenty pounds occasionally and ten pounds frequently; carrying twenty pounds occasionally and ten pounds frequently; sitting and standing for six hours each, alternating to the other for ten minutes after every two hours; walking for six hours; pushing and pulling as much as the individual can lift and carry; frequently reaching overhead to the left and right; only occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; avoiding even moderate exposure to hazards, such as machinery, heights, etc.; and requiring a low stress environment with low background noise (t. 94–95). The ALJ then asked Ms. Jerrell whether such an individual could perform any of Ms. Deyounks' past jobs (t. 95). Ms. Jerrell said it would depend on whether low stress means low skilled but that "a desk clerk would certainly accommodate that type of medical" (*id.*). Ms. Jerrell also said the hypothetical individual could perform the laundry clerk job, as generally performed but not as Ms. Deyounks performed it, which was at the

medium exertional level; the daycare worker job; the receptionist/clerical job; and the night auditor job (t. 96). She said the other jobs—business owner and bookkeeper—are highly skilled "and might bring tension" (*id.*).

The ALJ added the additional limitation that the hypothetical individual would have to wear a back brace when needed and asked whether that would affect any of the previously identified jobs (t. 97). Ms. Jerrell responded "[n]o, absolutely not" (*id.*). The ALJ then added that the hypothetical individual experienced pain during ten percent of the workday that occasionally interfered with concentration but did not require the individual to abandon the workstation and asked whether the jobs would still be available (*id.*). Ms. Jerrell again responded in the affirmative (*id.*). The ALJ asked Ms. Jerrell if there were other jobs the hypothetical individual could perform (*id.*). Ms. Jerrell said "[y]es" and identified retail cashier checker, which is light and semi-skilled; salesperson of general merchandise, which is light and semi-skilled; and companion, which also is light and semi-skilled (*id.*).

Continuing, the ALJ asked Ms. Jerrell if she were to add in any of the three hypotheticals that the individual would be off-task for twenty percent of the workday, or absent during twenty percent of the workday, would the individual be able to perform any of Ms. Deyounks' past work or other jobs (t. 98). Ms. Jerrell said "[n]o, absolutely not" (*id.*). She added "[t]hey would not be able to maintain employment if they were off task 20 percent of the day" (*id.*).

Finally, the ALJ asked Ms. Jerrell if she were to change the exertional level to *sedentary*, "with the same limitations" could the individual perform any of Ms. Deyounks' past jobs (*id.*). Ms. Jerrell said such an individual could be a night auditor (*id.*).

Ms. Deyounks' counsel asked if the hypothetical individual would be able to perform any of Ms. Deyounks' past work if limited to occasional handling and fingering (t. 102). Ms. Jerrell said "[n]o" (*id.*). Ultimately, the ALJ found Ms. Deyounks capable of performing past relevant work as a night auditor and desk clerk; she also found Ms. Deyounks capable of performing other light, unskilled work, including as a maid, parking lot attendant, and sales attendant (t. 34–36).

## ANALYSIS

### I. Mental Impairments

Ms. Deyounks first complains the ALJ erred in finding she does not suffer from a severe mental impairment. Specifically, Ms. Deyounks complains the ALJ erroneously disregarded Dr. Reeves' opinion. She also contends the ALJ ignored notations throughout the record of symptoms of depression and anxiety, pointing out a number of instances in the record in which she was noted to have such symptoms (t. 396–99, 440, 490–91, 514, 516, 522, 528, 616–21, 623, and 701).

### A. Dr. Reeves' Opinion

In evaluating medical opinions, an ALJ considers numerous factors, including whether the doctor examined or treated the claimant, the evidence the doctor presents to support his or her opinion, and whether the opinion is consistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ may choose to accept some conclusions—or restrictions—within an opinion while rejecting others. If such a choice is made, in addition to explaining the overall weight given a particular medical opinion, the ALJ must explain "'with at least some measure of clarity the grounds for [a] decision'" to adopt particular aspects of a medical opinion. *Winschel v. Comm'r Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (*quoting Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984)). Failure to explain the rationale for crediting only certain aspects of an opinion will result in a reviewing court "declin[ing] to affirm 'simply because some rationale might have supported the ALJ's conclusion.'" *Id*.

A treating source's opinion generally is entitled to more weight, and an ALJ must give good reasons for discounting such an opinion. *See* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); *Winschel*, 631 F.3d at 1179. The opinion of a non-treating physician, however, is not entitled to any deference or special consideration. *See* 20 C.F.R. §§ 404.1502, 404.1527(c)(1), (c)(2), 416.902,416.927(c)(1), (c)(2); *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877–78 (11th Cir. 2013); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155,

1160 (11th Cir. 2004). Moreover, opinions on certain issues, such as a claimant's RFC and whether a claimant is disabled, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d); *see* SSR 96-5p. Opinions reserved to the Commissioner, even when offered by a treating physician, are not entitled to controlling weight or special significance. *See* SSR 96-5p. Indeed, "[g]iving controlling weight to such opinions . . . would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Id.* Although a physician's opinions about what a claimant can still do or the claimant's restrictions may be relevant, therefore, such opinions are not determinative because the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. §§ 416.927(d), 416.945(a)(3), 416.946(c); SSR 96-5p.

Dr. Reeves conducted a consultative psychological evaluation of Ms. Deyounks on August 8, 2015 (t. 581–88). Ms. Deyounks was dressed casually and neatly and had adequate hygiene and grooming (t. 581). She was pleasant, cooperative, and forthcoming and had normal conversation, eye contact, and interpersonal interactions (*id.*). Her speech, including its rate, tone, and volume, were normal, and "[s]he was talkative and expressive" (*id.*).

Ms. Deyounks informed Dr. Reeves she "felt her depression and anxiety started in her childhood related to emotional abuse by her father, ridiculing her about . . . being overweight, and later when her favorite half-brother died in a car accident when she was 11" (*id.*). She said "the course of her depression and anxiety were variable related to her serious drug use in her early 20s and relationship issues" (*id.*). She mentioned marital problems and indicated worrying about the whereabouts of her husband made her anxious, as did worrying about her son when she was not with him[11] (t. 582). Dr. Reeves repeatedly noted Ms. Deyounks "seemed to emphasize" medical reasons for her alleged inability to work but that she also indicated "[s]he experienced depression throughout her life and this resulted in lower motivation and energy" (*id.*).

Dr. Reeves observed that Ms. Deyounks did not return to work after leaving the dry-cleaning job so she could stay home to take care of her son (*id.*); he later referenced "reported medical problems that [Ms. Deyounks] said were disabling" (t. 582, 587). Dr. Reeves also noted Ms. Deyounks "said she would like to work but . . . would need significant medical treatment and improvement before that would be possible" and that she "was willing to try mental health treatment again" (t. 582). Dr. Reeves reported Ms. Deyounks "participated in counseling and received medication from Donna Dillon . . . in 2011" (*id.*). Specifically, Dr. Reeves noted

---

[11] Ms. Deyounks was still married when she saw Dr. Reeves.

Ms. Deyounks "took Prozac, Trazodone, and Vistaril, for depression, sleep, and anxiety," respectively, and was diagnosed with major depressive disorder ("MDD") and generalized anxiety disorder ("GAD") but "later stopped seeing [Ms. Dillon] and quit taking her medications" (*id.*).  Ms. Deyounks was taking no psychiatric medication at the time she saw Dr. Reeves, having weaned herself off of it over the course of a couple of months because of side effects (t. 582–83).  She indicated she tried to schedule an appointment with a psychologist to whom she had been referred "but never heard back" (*id.*).

Ms. Deyounks told Dr. Reeves she took care of her son and performed all indoor chores, including cooking and cleaning (*id.*).  She socialized with her son, husband, and mother and also attended church (*id.*).  She had to cut ties with all of her friends after having a child due to their "ongoing drug issues" (*id.*).  When addressing Ms. Deyounks' ability to complete tasks timely and appropriately, Dr. Reeves again indicated Ms. Deyounks "seemed to emphasize her medical problems in her disability claim but felt her depression and anxiety affected her overall functioning, including attention, concentration, and persistence" (*id.*).

Ms. Deyounks discussed her pregnancy and the fact that she never expected to get pregnant and "was shocked, broke down," wondering why it could not have happened ten to twenty years earlier (*id.*).  She explained she had to give up her job at the dry-cleaning business because of her pregnancy and "decided to be [a] stay at

home mom," which she enjoyed although "it made it rough" because she was "used to working and being out of the house" (t. 584). She said her current stress stemmed from not being able to work and having to rely on her mother for assistance, which "turns her [mother] into a control freak" (*id.*). Ms. Deyounks explained her mother was helping her out "until [she] can get employment or SSI" (t. 586).

Dr. Reeves found Ms. Deyounks' thinking generally logical, coherent, and organized (*id.*). There were no outward signs of perceptual disturbance or delusional beliefs (*id.*). She scored 29/30 on the Mini-Mental State Examination, indicating no gross cognitive impairment (t. 587). Her recall was good, her judgment was fair, and she had normal attention and concentration, as well as an "understanding of the causes and parameters of her emotional issues" (*id.*). She nevertheless appeared depressed and endorsed a depressed mood (t. 586). Dr. Reeves diagnosed MDD and moderate to severe GAD and assigned a GAF score of 50, finding that while it "seems Ms. Deyounks' primary disability claim is medical in nature, . . . her depression and anxiety further contribute to less than optimal functioning" (t. 587–88).

The ALJ assigned only partial weight to Dr. Reeves' opinion regarding the severity of Ms. Deyounks' mental impairment, finding that "[a]lthough the claimant suffers from MDD and GAD, the severity of the claimant's mental impairment symptoms is mild, and Dr. Reeves['] moderate to severe diagnosis is inconsistent

with the record" (t. 33).    In so finding, the ALJ cited Dr. Reeves' repeated observations that Ms. Deyounks' complaints were primarily physical, as well as his conclusion that "her depression and anxiety only further contribute to less than optimal functioning" (*id.*).  The ALJ additionally noted that in February 2015, Ms. Deyounks' mental status examination was within normal limits, and her depression was found to be in remission (*id.*).  The undersigned finds that substantial evidence in the record supports the ALJ's decision to give only partial weight to Dr. Reeves' opinion.

As an initial matter, as set forth above, when asked about the severity of her depression at the time of the hearing in comparison to the day she saw Dr. Reeves, Ms. Deyounks indicated her depression was worse when she saw Dr. Reeves because she and her husband had just separated for the first time.  That fact alone casts doubt on the accuracy of Dr. Reeves' findings, particularly on a longitudinal basis. Moreover, although there is evidence Ms. Deyounks suffers from depression and anxiety, there simply is no evidence in the record that either condition is of disabling severity.[12]

As the Commissioner observed, Ms. Deyounks received mental health treatment for depression and anxiety from the Bond Community Health Center

---

[12] It bears repeating that Dr. Reeves found only that Ms. Deyounks' mental impairments "contribute to less than optimal functioning;" he expressed no opinion on the extent to which Ms. Deyounks' mental impairments may or may not impact her ability to work (t. 588).

("Bond Center"), a primary health care clinic.  It appears her first appointment was on October 29, 2010, at which time she complained of depression and problems with her temper (t. 431).  She was not taking medication for depression at the time, but Dr. Sara Wahba prescribed Fluoxetine (*id.*).  Ms. Deyounks returned to the Bond Center for "ear itching" on January 4, 2011 (t. 428).  There is no indication she complained of depression or anxiety at that time (*id.*).  One week later, Donna Dillon, ARNP, performed a psychiatric evaluation (t. 424).  Ms. Deyounks was neatly groomed and cooperative and had good eye contact, a normal affect, and normal thought process with appropriate thought content (t. 426).  She was alert and oriented and had an intact memory (*id.*).  Her insight was good to fair, and her judgment was good (*id.*).  Ms. Deyounks' mood also was good, and she had decreased depression, anxiety, and irritability but was tired (*id.*).  Ms. Dillon found Ms. Deyounks capable of living independently, caring for her physical needs, expressing her needs in a manner that elicits help, taking medication as agreed, seeking assistance as needed, using community resources, recognizing stressors that worsen her illness, and participating in her care (*id.*).  Ms. Dillon diagnosed major depression and prescribed Prozac and Trazodone (t. 427).

Ms. Deyounks returned to the Bond Center on February 8, 2011, for a routine follow-up visit (t. 423).  Ms. Dillon indicated Ms. Deyounks felt much better taking Prozac and that Trazadone helped her avoid sleepiness during the day time (*id.*).  Ms.

Deyounks was still easily irritated, but Ms. Dillon indicated the irritability was appropriate (*id.*). Ms. Deyounks was neatly groomed, cooperative, and alert and oriented (*id.*). She had good eye contact, a normal affect, normal thought process, appropriate thought content, an intact memory, and good insight and judgment (*id.*). Ms. Dillon again indicated a good and improved mood, as well as decreased depression, anxiety, irritability, and tiredness (*id.*).

Ms. Deyounks next visited the Bond Center on April 5, 2011 (t. 422). She continued to feel better as a result of Prozac, but she was still easily irritated and was shaking and trembling all the time (*id.*). She was sleeping well but felt she had a lot of "nervous energy" (*id.*). Her exam otherwise was the same as the last (*id.*). Ms. Dillon prescribed Atarax for anxiety/irritability (t. 421–22). Ms. Deyounks' June 7 appointment revealed essentially the same status, except her insight was fair and her judgment was good to fair (t. 421). She reported feeling well on medication but having continued irritability, although the shakiness had stopped (*id.*). Ms. Dillon increased the dosage of Atarax (*id.*). On August 19, Ms. Deyounks' judgment was good and there was no indication of irritability (t. 420). Ms. Dillon increased the Prozac dosage and prescribed Vistaril, rather than Atarax, for anxiety (*id.*). During an October 12 appointment, Ms. Deyounks reported she was "doing great" (t. 419). Ms. Dillon did not indicate any depression, anxiety, irritability, or tiredness and noted Ms. Deyounks' judgment and insight were good, as was her mood (*id.*).

ARNP Kelley Miller found intact judgment and insight, full orientation, intact memory, and no depression, anxiety, or agitation the next day (t. 416). The same was true a month later, during a visit on November 17 (t. 403).

On January 26, 2012, Ms. Deyounks reported she was "looking for work" (t. 399). She had increased anxiety and irritability, feeling as if her "nerves [were] on edge"—seemingly due, at least in part, to the fact that she was living with her mother, who apparently irritated her (*id.*). Ms. Dillon increased the Vistaril dosage (*id.*). As of the next visit, on February 23, Ms. Deyounks was feeling better due to the change in medication, but she was still living with her mother because she was financially unable to move (t. 398). There was no indication of depression or irritability on that date, and she had a good mood and decreased anxiety (*id.*).

Ms. Deyounks did not appear for her appointment on May 10, 2012 (t. 397). The following month, she again complained of anxiety but not depression (t. 396). She was alert and had a normal affect, appropriate thought content, intact memory, fair insight, and good judgment (*id.*). She said she needed medication to sleep (*id.*). Ms. Dillon decreased Ms. Deyounks' anxiety medication, which apparently contributed to the sleep problem (*id.*). On August 16, 2012, Ms. Deyounks complained of physical pain and reported she was not sure whether depression and anxiety were causing her pain or vice versa (t. 390). The following week, Ms. Deyounks was "doing ok" but "anxious about getting child" (t. 389). There was no

indication of depression—in fact, Ms. Dillon indicated Ms. Deyounks' depression had improved as of that date—and Ms. Deyounks had a good mood and decreased anxiety (*id.*). Ms. Dillon nevertheless increased the Prozac dosage (t. 386, 389).

On September 20, 2012, Ms. Dillon completed a Mental Status Report (t. 432–34). She noted Ms. Deyounks' depression was in remission with medication and that although she had some anxiety about her child, she was "very stable" (t. 432). Ms. Deyounks' thought process was organized, goal oriented, and logical, and her concentration and orientation were good, as were her immediate, recent, and remote memory (t. 433). Ms. Deyounks' behavior was appropriate, and her appearance was neat (*id.*). Ms. Dillon indicated Ms. Deyounks had the capacity to understand and interact socially (t. 434). She diagnosed major depression, "nearly in remission with meds," and "some situational anxiety" (*id.*). She was unable to opine as to Ms. Deyounks' ability to sustain full-time work because she saw Ms. Deyounks for only "very short periods"—typically fifteen minutes at a time for medication refills (*id.*).

Ms. Deyounks returned to the Bond Center on October 11, 2012 (t. 616), at which time she reported the increased Prozac dosage "helped a lot"; she also said she was sleeping well on Trazodone (*id.*). Ms. Deyounks' son was doing well in school, which "made [a] difference for her" (*id.*). She was neatly groomed and cooperative, with good eye contact and normal speech (*id.*). There was no indication of depression, but she reported symptoms of anxiety and irritability and being "upset

periodically" (*id.*).  She nevertheless had normal thought process and appropriate thought content (*id.*).  She was alert, her recent and remote memory were intact, and her insight and judgment were good (*id.*).  There is no indication in the record of further mental health treatment after the Bond Center visit of October 11, 2012.[1]

As Ms. Deyounks points out, she reported symptoms of depression and anxiety to non-mental health providers.  When she visited the Digestive Disease Clinic ("DDC") on December 15, 2006, she reported anxiety but no depression (t. 710).  She was alert and cooperative and had an appropriate affect (*id.*).  On December 20, 2006, and January 16, 2007, Ms. Deyounks again was alert and cooperative and had an appropriate affect (t. 705, 707).  Ms. Deyounks visited the Arthritis Center of Tallahassee, FL, on July 10, 2013 (t. 623).  In a letter to Ms. Deyounks' general practitioner, Dr. John M. Szeczsny indicated Ms. Deyounks was experiencing symptoms of depression (*id.*).  When Ms. Deyounks' neurologist, Winston Ortiz, M.D., performed a neurologic exam for chronic neck pain on August 15, 2014, he noted Ms. Deyounks has a past history of depression and anxiety and complained of nervousness, tension, and depression (t. 493–94).  She was alert and

---

[1] It bears noting that the time frame relevant to Ms. Deyounks' claim for SSI is March 16, 2015 (the date she applied for SSI), through January 19, 2018 (the date the ALJ issued her decision). *See Moore*, 405 F. 3d at 1211 (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).  It thus appears Ms. Deyounks did not receive mental health treatment during the almost two-and-a-half year period preceding the filing of her claim.

cooperative, however, and her mood and affect were normal, and she had normal cognition, memory, attention span, and concentration (t. 495).

On August 25, 2014, Dr. Joshua E. Fuhrmeister, Ms. Deyounks' pain management doctor, noted Ms. Deyounks complained of depression and anxiety and expressed concern she might run out of Klonopin, which had been prescribed for sleep, before she was able to get a refill from her new primary care physician (t. 489, 491). Dr. Fuhrmeister refilled the prescription but indicated it was a one-time prescription "to avoid withdrawal until she is able to establish with her new primary care provider" (t. 491). Dr. Fuhrmeister did not make any findings regarding Ms. Deyounks' mental state.

Ms. Deyounks visited Tallahassee Memorial Hospital ("TMH") on September 5, 2014, to establish new primary care (t. 511). She reported various physical conditions, but there is no mention of any mental impairment or medication for the same (t. 511–14). Ms. Deyounks saw her hematologist, Dr. Iman Imanirad, on November 13, 2014 (t. 440). Dr. Imanirad noted mood swings and depression and that Ms. Deyounks was positive for nervousness and anxiety (id.). Ms. Deyounks visited the Tallahassee Orthopedic Clinic on February 5, 2015, complaining of spine, hip, and knee pain (t. 528–30). Dr. Kris Sowers noted Ms. Deyounks "admit[ted] to feelings of anxiety and feeling depressed" but found her adequately groomed;

oriented to time, place, and person; and to have an appropriate mood and affect (t. 528–29).

Ms. Deyounks returned to DDC for a gastrointestinal consultation on February 10, 2015, upon the request of her hematologist (t. 700). Ms. Deyounks reported depression and anxiety but was cooperative and had an appropriate affect (t. 701–02). During a March 24 visit, ARNP Todd Chenicek noted Ms. Deyounks was experiencing no symptoms of depression or anxiety (t. 697–98). Notes from March 4 and April 15, 2015, appointments at Tallahassee Neurological Clinic ("TNC"), however, indicate Ms. Deyounks complained of depression and anxiety (t. 516, 522). The same was true during a visit to TNC on October 6, 2016, when Ms. Deyounks again complained of depression and anxiety but had normal cognition, memory, attention span, and concentration (t. 665).

Jessy Sadovnik, Psy.D., and Heather Hernandez, Ph.D., state agency consultants, reviewed the record on August 26 and October 27, 2015, respectively, and found Ms. Deyounks' mental impairments were not severe and caused no more than mild limitations (t. 108–14, 126–28). They found Ms. Deyounks capable of independent functioning from a mental standpoint and did not assess any functional limitations (t. 113–14, 127). Like Dr. Reeves, Drs. Sadovnik and Hernandez noted Ms. Deyounks "alleges more severe limitations in functioning which are attributable to allegations regarding physical problems" (t. 114, 127). The ALJ gave great

weight to the opinions of Dr. Sadovnik and Dr. Hernandez, finding them consistent with the evidence of record and with the RFC[13] (t. 33).

As the facts set forth above demonstrate, the objective medical evidence plainly supports the ALJ's decision that Ms. Deyounks does not suffer from severe mental limitations. Ms. Deyounks' functional abilities further support the ALJ's determination in that regard. In finding Ms. Deyounks' mental impairments not severe, the ALJ assessed each of the "four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments," or "Paragraph B" criteria (t. 18). With regard to the first area of functioning—understanding, remembering, and applying information—the ALJ found Ms. Deyounks had only mild limitation (*id.*). As the ALJ observed, the "[e]vidence reflects that the claimant can learn, recall, and use information to perform job activities," some of which "include understanding, and learning terms, instructions, and procedures" (*id.*). Ms. Deyounks testified she is the primary caregiver for her nine-year-old son (*id.*). She has a valid driver's license and drives her son to and from school and to run errands (*id.*). She helps her son with school work every day and cooks and cleans (*id.*). She is able to pay bills, count change, manage a savings account, use a checkbook, and send money orders (*id.*). Such

---

[13] The ALJ, however, assigned additional limitations to account for Ms. Deyounks' neck and back pain (t. 33–34).

evidence, as the ALJ determined, even when viewed in the light most favorable to Ms. Deyounks, shows Ms. Deyounks has only mild restriction in understanding, remembering, and applying information (*id.*).

Turning to the second functional area—interacting with others—the ALJ found no limitation (*id.*). As the ALJ indicated, the record reflects Ms. Deyounks can relate to and work with supervisors, co-workers, and the public (*id.*). "A few job activities include asking for help when needed, stating one's point of view, and initiating or sustaining a conversation," all of which Ms. Deyounks plainly is able do (*id.*). She lives alone with her son in a single-family dwelling for which she pays no rent due to an agreement she made with the landlord (*id.*). When asked at the hearing why her husband did not work fulltime while living at home, Ms. Deyounks "had no problem stating her point of view when she responded, 'Because he's lazy'" (t. 19). She had a "pleasant demeanor and talkative nature at the initial hearing," thereby "demonstrat[ing] her ability to interact comfortably in a public forum" (*id.*). She has a good relationship with her mother, who provides her with financial assistance (*id.*). She goes to church and has no problem getting along with family, neighbors, and others, including authority figures (*id.*). There is no indication Ms. Deyounks was ever terminated from employment for an inability to get along with co-workers or supervisors. Moreover, during a telephonic interview with a Social Security representative in April 2015, Ms. Deyounks had "no difficulty talking and

answering the representative's questions" (*id.*).  In fact, at the initial hearing, Ms. Deyounks interjected during the vocational expert's testimony to clarify a fact regarding her past employment (t. 103).  As the ALJ found, Ms. Deyounks' "ability to independently, appropriately and effectively interact with her son, mother, property owner and the public supports the . . . finding[] that the claimant has no limitation in this [second] functional area" (t. 19).

The ALJ likewise found no limitation with respect to concentration, persistence, and pace, the third functional area (*id.*).  As the ALJ observed, the evidence of record reflects Ms. Deyounks can focus attention on work activities, including maintaining an ordinary routine and regular attendance, and stay on task at a sustained rate (*id.*).  Although Ms. Deyounks testified at the hearing she has problems focusing and concentrating, "the evidence supports that the claimant can concentrate, persist and maintain pace," both in public/work settings and at home (*id.*).  Again, Ms. Deyounks is the primary caregiver for her son and has no problem in that regard (*id.*).  She is able to handle financial matters (*id.*).  She was able to understand and concentrate on the task when interviewed by a Social Security representative (*id.*).  The ALJ observed no problem with Ms. Deyounks' ability to focus, concentrate, and understand questions posed to her at the hearing and, in fact, found her "responses . . . detailed, focused and well defined" (*id.*).  Not only did Ms. Deyounks respond meaningfully to questions, but as set forth above, she actually

interjected to clarify a fact (t. 103). As the ALJ concluded, "[t]he claimant's ability to sustain focused attention and concentration with activities such as these supports the . . . finding[] that the claimant has no limitation in this functional area" (t. 19).

Finally, the ALJ found no limitation in the fourth functional area, the ability to adapt and manage oneself (t. 19). In so finding, the ALJ pointed to the fact that the evidence of record "reflects that the claimant can control her behavior, and maintain well-being in a work setting" (*id.*). Ms. Deyounks "testified she has no problems with self-care and the care of her son. She has a good relationship with the property owner where she resides and has managed to continue to live in her single-family home without the need to pay rental costs" (*id.*). "The claimant supports herself and her son with . . . assistance from the State and the help of her mother" (*id.*). "These examples demonstrate that the claimant knows where to find resources to meet her and her son's life needs," and "[s]he has shown that she can positively adapt to change" (*id.*). The ALJ determined "[t]he claimant's ability to sustain these activities supports the . . . finding[] that the claimant has no limitation in this last functional area" (*id.*).

After assessing each of the functional areas, the ALJ concluded that "[b]ecause the claimant's medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas, they are non-severe" (t. 20). The undersigned finds the ALJ's conclusion in that regard supported by

substantial evidence in the record.  In short, Dr. Reeves' opinion is the only objective

evidence in the record that even arguably supports Ms. Deyounks' position that she

suffers from severe impairments due to depression and anxiety.  A diagnosis alone,

however, is insufficient to establish the condition caused limitations warranting a

finding of a severe impairment.  *See Moore*, 405 F.3d at 1213 n.6 ("[T]he mere

existence of these impairments does not reveal the extent to which they limit her

ability to work or undermine the ALJ's determination in that regard"); *Wind v.

Barnhart*, 133 F. App'x 684, 690 (11th Cir. 2005) (stating "a diagnosis or a mere

showing of 'a deviation from purely medical standards of bodily perfection or

normality' is insufficient; instead, the claimant must show the effect of the

impairment on her ability to work") (*quoting McCruter v. Bowen*, 791 F.2d 1544,

1547 (11th Cir. 1986)); *see also Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir.

1986) (holding that "a psychological disorder is not necessarily disabling.  There

must be a showing of related functional loss.").  That is particularly true where, as

here, there is substantial objective evidence to the contrary and the claimant

acknowledged she was more depressed than usual on the date of the examination on

which the diagnosis at issue was based.  The undersigned thus finds the ALJ did not

err in assigning only partial weight to Dr. Reeves' opinion regarding the severity of

Ms. Deyounks' mental limitations.  *See, e.g., Hutchinson v. Astrue*, 408 F. App'x

324, 327 (11th Cir. 2011) (concluding evidence supported ALJ's finding of no

severe mental impairment because "[t]he scant objective evidence, even if viewed in [claimant's] favor, merely established at most that the depression and anxiety existed"; claimant did not seek mental health treatment; and claimant failed to show when or how her mental condition affected her ability to perform basic work skills); *Gibbs v. Barnhart*, 130 F. App'x 426, 431 (11th Cir. 2005) (affirming ALJ's finding that mental impairment controlled by medication did not constitute a severe impairment).

## B. Symptoms of Depression and Anxiety

As set forth above, Ms. Deyounks also contends the ALJ ignored references in the record to symptoms of depression and anxiety.  Although the record contains a number of instances in which Ms. Deyounks' providers noted depression and anxiety, those notes are based almost entirely on Ms. Deyounks' subjective complaints.  And the ALJ found Ms. Deyounks' statements concerning the intensity, persistence, and limiting effects of her symptoms not entirely consistent with the medical evidence and other evidence in the record, a finding Ms. Deyounks does not challenge on appeal (t. 24).  *See* 20 C.F.R. § 416.908 (stating a claimant may not rely solely on her statements to show an impairment exists); *Hutchinson*, 408 F. App'x at 327.  Moreover, as the Commissioner points out and as detailed above, the same providers who noted symptoms of depression and anxiety repeatedly observed Ms. Deyounks as cooperative, alert and oriented, and having a normal mood and

affect.  Hence, even if the ALJ did not specifically address multiple references to Ms. Deyounks' complaints of depression and anxiety, she did not err in that regard. And even if the ALJ had erred, any such error would be harmless because substantial evidence in the record supports the ALJ's decision that Ms. Deyounks' mental impairments are not severe.  Any error in finding Ms. Deyounks' mental impairments not severe likewise would be harmless because the ALJ found Ms. Deyounks suffers from other severe impairments and considered depression and anxiety throughout the decision.  *See Denomme*, 518 F. App'x at 877 ("When, however, an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand.").  As the Eleventh Circuit has observed, an error in finding a particular impairment not severe is harmless when the ALJ finds another severe impairment because "that finding is all that step two requires." *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824–25 (11th Cir. 2010); *see Griffin v. Comm'r of Soc. Sec.*, 560 F. App'x 837, 842 (11th Cir. 2014) (holding that the finding of any severe impairment is enough to satisfy step two and any error in not finding a particular impairment severe was harmless because the ALJ considered all impairments at the third step by finding the claimant did not have an impairment or combination of impairments that met a listing); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850,

853–54 (11th Cir. 2013) (finding no error where the ALJ proceeded past step two and considered and discussed the symptoms alleged to stem from the impairment).

## II. Effect of Non-Severe Impairments

Ms. Deyounks next argues the ALJ erred in failing to consider the impact of her non–severe impairments—specifically, depression and anxiety—on her RFC. Ms. Deyounks contends the ALJ was required to consider the combined effects of all medically determinable impairments, whether severe or not. She also faults the ALJ for "not resolv[ing] a major discrepancy between her finding and that of the state agency's psychological consultant," Dr. Sadovnik (ECF No. 14 at 3). Ms. Deyounks points to the fact that the ALJ gave great weight to the opinion of Dr. Sadovnik, who fully credited Ms. Deyounks' "functional statements," including that Ms. Deyounks had no friends and thus did not go out with friends; Ms. Deyounks had problems getting along with her family due to concentration and memory issues; Ms. Deyounks' mind wandered and she forgot things unless she wrote them down; and Ms. Deyounks did not handle changes in routine well (*id.*).

### A. Combined Effect of Impairments

"Where a disability claimant has alleged several severe impairments, the Secretary has a duty to consider the impairments in combination and to determine whether the combined impairments render the claimant disabled." *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991); *see also Jones v.*

*Bowen*, 810 F.2d 1001, 1006 (11th Cir. 1986) ("It is now well settled that the ALJ must consider the combined effects of a claimant's impairments in determining whether he is disabled."). The Eleventh Circuit found the following statement sufficient to demonstrate the ALJ satisfied his obligation in that regard: "based upon a thorough consideration of all evidence, the ALJ concludes that [claimant] is not suffering from any impairment, *or a combination of impairments* of sufficient severity to prevent him from engaging in any substantial gainful activity for a period of at least twelve continuous months." *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986) (emphasis in original).

Here, the ALJ found that Ms. Deyounks suffered from a number of severe impairments, as well as non-severe physical and mental impairments (t. 17–20). The ALJ expressly stated she "considered each of the claimant's impairments *individually and in combination with* all medically determinable impairments discussed in th[e] decision," including Listing "12.04 pertaining to depressive, bipolar and related disorders, and 12.06 pertaining to anxiety and obsessive-compulsive disorders," and found "[t]he medical evidence does not demonstrate that the claimant's impairments, *considered singly or in combination*, meet or equal the severity of Listings in 1.04, 12.04, 12.06 or any other section contained in Appendix 1" (t. 20–21) (emphases added). The ALJ thus plainly considered the combination of Ms. Deyounks' impairments, including MDD and GAD, and made sufficient

findings regarding the effects thereof. *See Wilson*, 284 F.3d at 1224–25. Even if she had not, Ms. Deyounks has wholly failed to explain how additional consideration of the combination of impairments would lead to a finding of disability. Ms. Deyounks therefore has not shown the ALJ erred by failing to consider the combined effect of her impairments.

    B. Dr. Sadovnik

    With regard to Dr. Sadovnik's opinion, Ms. Deyounks refers to a "major discrepancy" between the ALJ's finding and Dr. Sadovnik's opinion (ECF No. 14 at 3). Ms. Deyounks, however, does not specify the ALJs finding or alleged discrepancy to which she refers, and she does not allege any error in connection therewith. Such claim thus plainly fails.

    To the extent Ms. Deyounks' position is that because the ALJ gave great weight to the opinion of a doctor who credited Ms. Deyounks' subjective complaints, the ALJ likewise should have fully credited Ms. Deyounks' subjective complaints or at least explained her failure to do so in light of the decision to give great weight to Dr. Sadovnik's opinion, Ms. Deyounks' argument misses the mark. Indeed, the ALJ gave great weight to Dr. Sadovnik's *medical opinion* regarding the severity of Ms. Deyounks' mental impairments—not his assessment of Ms. Deyounks' credibility (t. 33). As a result, even if the ALJ disagreed with Dr. Sadovnik's decision to fully credit Ms. Deyounks' subjective complaints, there is no discrepancy

in the ALJ  assigning great weight to Dr. Sadovnik's opinion regarding the severity of Ms. Deyounks' mental impairments.  Even if there was a discrepancy, it would be of no consequence because even crediting Ms. Deyounks' subjective statements, Dr. Sadovnik, like the ALJ, found Ms. Deyounks' mental impairments non-severe (t. 112–14).

### III.   Opinion of State Agency Consultant Loc Kim Le

Finally, Ms. Deyounks argues the ALJ erred in relying on the opinion of Loc Kim Le, a state agency medical consultant, because Dr. Le rendered his opinion before all the medical evidence was submitted.  The evidence to which Ms. Deyounks refers is what she characterizes as a May 2, 2016, finding of decreased range of motion in the spine (t. 642)[14]; August 1, 2016, "notes of concern of spinal stenosis because nerve conduction study found only sensory carpal tunnel syndrome" (ECF No. 14 at 4) (t. 653); a September 7, 2016, MRI of the lumbar spine that revealed moderate spinal stenosis at levels L3–L4 and L4–L5, right foraminal narrowing at L3–L4, and bilateral foraminal narrowing at level L4–L5 (t. 657); and October 6, 2016, notes from Dr. T. Adam Oliver, a neurosurgeon, regarding "loss of normal lordosis, severely desiccated disks with loss of height at levels L3–4 and L4–5, total effacement of the foramen at level L3–4, and compression of the existing L3 nerve root" (ECF No. 14 at 4) (t. 666–67).

---

[14] The record actually is dated June 2, 2016.

As recognized in the regulations, state agency medical and psychological consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." *See* 20 C.F.R. § 404.1527(e)(2)(I).  Under the applicable law, an ALJ may rely upon, and must consider, the opinions of state agency consultants.  *See* 20 C.F.R. § 404.1527(e)(2); *see also Voronova v. Astrue*, No. 3:11cv709-J-32JBT, 2012 WL 2384414, at *4 (M.D. Fla. May 7, 2012) (acknowledging the ALJ is required to consider opinions of non-examining state agency medical and psychological consultants).  Specifically, although not bound by such opinions, the ALJ "must consider findings and other opinions of state agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether [claimant is] disabled. . . ."  20 C.F.R. § 404.1527(e)(2)(I).

When considering the findings of a state agency medical or psychological consultant, the ALJ will look to factors "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  The ALJ determines the weight afforded to consultants and, if the ALJ affords controlling weight to such a consultant rather than to a treating source, the ALJ must explain the

weight given the opinion, just as with other medical sources. *Id.; see Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (holding that, in a proper case, the ALJ does not err by giving substantial weight to the opinions of non-examining physicians, including state agency medical and psychological consultants).

In this instance, Dr. Le reviewed the record in November 2015 and opined Ms. Deyounks was capable of performing light work with postural and environmental limitations (t. 129–31). Specifically, Dr. Le determined Ms. Deyounks was limited to occasional climbing of ramps, stairs, ladders, ropes, and scaffolds and should avoid even moderate exposure to hazards such as machinery and heights (*id*). The fact that Dr. Le did not review all of the evidence does not render erroneous the ALJ's decision to give Dr. Le's opinion great weight. Indeed, an ALJ does not err in relying on the opinion of a doctor who was unable to review subsequent records, provided *the ALJ* considers the relevant medical records submitted after the opinion was rendered and substantial evidence otherwise supports the ALJ's decision. *See Surber v. Comm'r of Soc. Sec. Admin.*, No. 3:11cv1235-J-MCR, 2013 WL 806325, at *6 (M.D. Fla. Mar. 5, 2013) (finding ALJ did not err in relying on outdated opinion where he considered the relevant medical records submitted after the opinion was rendered); *Mullis v. Astrue*, No. 07-1986, 2008 WL 4452343, at *15-16 (N.D. Ga. Sept. 30, 2008) (finding ALJ did not err in adopting agency reviewing consultant's opinion rendered two years prior to ALJ's

decision where objective medical evidence otherwise supported ALJ's decision); *cf.*

*Zellner v. Astrue*, No. 308-1205, 2010 WL 1258137, at *7 (M.D. Fla. Mar. 29, 2010)

(finding reliance on outdated consultant's opinion would not require reversal if ALJ

had also considered all evidence of record).

Here, after discussing the relevant medical evidence, including neurological

records from 2016, the ALJ assigned great weight to Dr. Le's opinion, finding it

consistent with the evidence of record (t. 33). The ALJ nevertheless granted

additional limitations to accommodate Ms. Deyounks' neck and back pain (t. 34).

In particular, the ALJ limited Ms. Deyounks to standing and walking for no more

than three hours each and up to only one hour at a time (t. 21). The ALJ found Ms.

Deyounks could never climb ladders, ropes, or scaffolds and only occasionally

balance, stoop, kneel, crouch, and crawl (t. 21). The ALJ also imposed restrictions

on reaching and exposure to vibration (t. 21). Considering the ALJ specifically

referenced medical evidence from 2016, including neurological records, and

imposed greater restrictions than Dr. Le imposed, it is plain the ALJ considered

evidence submitted after Dr. Le rendered his opinion and imposed additional

limitations accordingly (t. 21, 129-30).

Moreover, contrary to Ms. Deyounks' assertion, the RFC was not based

entirely on Dr. Le's opinion. The ALJ considered medical evidence, opinion

evidence, and Ms. Deyounks' self-report and hearing testimony in determining her

RFC. The ALJ's decision that Ms. Deyounks' is capable of light work is supported by substantial evidence in the record, as is the ALJ's decision to give great weight to Dr. Le's opinion, particularly in light of the additional restrictions the ALJ imposed. *See Wilkinson v. Comm'r of Soc. Sec.*, 289 F. App'x 384, 386 (11th Cir. 2008) (holding ALJ "did not give undue weight to the opinion of the non-examining state agency physician because he did not rely solely on that opinion").

Ms. Deyounks also complains the ALJ did not specifically mention Dr. Oliver's statement in the October 2016 treatment note regarding the results of the MRI that showed compression of the nerve root (t. 666). As the Commissioner points out, the ALJ need not cite particular phrases or discuss every piece of evidence as long as the decision is sufficient for the court to conclude the ALJ considered a claimant's condition as a whole. *See Lewen v. Comm'r of Soc. Sec.*, 605 F. App'x 967, 968 (11th Cir. 2015); *Dyer v. Barnhart*, 395 F.3d 1206, 1210–11 (11th Cir. 2005); *see also Newberry v. Comm'r, Soc. Sec. Admin.*, 572 F. App'x 671, 672 (11th Cir. 2014) (rejecting claimant's argument the ALJ erred by not explicitly assigning weight to every part of a doctor's opinion and not discussing a particular part of the doctor's opinion). In any event, the record shows the ALJ reviewed the findings of the MRI, as well as Dr. Oliver's treatment notes, and observed the diagnosis of radiculopathy (t. 29–30). The ALJ also discussed the results of physical examinations performed in 2016, when Ms. Deyounks reported pain from zero to

three on a ten–point scale (t. 28–30, 642, 655, 660, 665). The ALJ noted the examinations showed tenderness in the paraspinous muscles with decreased range of motion but no neurological deficits, no ataxia, normal muscle tone, normal strength, negative straight leg raises, and a steady gait (t. 28–30, 642, 655, 660, 665). Thus, the ALJ's failure to specifically reference Dr. Oliver's statement regarding MRI results does not constitute reversible error.

<u>CONCLUSION</u>

For the reasons set forth above, the undersigned finds that the Commissioner's decision is supported by substantial evidence in the record and results from the application of proper legal standards. Therefore, the decision should be affirmed.[15]

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the decision of the Commissioner be **AFFIRMED**, and this action be **DISMISSED**.

2.     That **JUDGMENT** be entered, pursuant to sentence four of 42 U.S.C. § 405(g), **AFFIRMING** the decision of the Commissioner.

3.     That the Clerk be directed to close the file.

---

[15] The court notes that, to the extent it reviewed the legal principles upon which the ALJ's decision is based, it conducted a *de novo* review. *See Moore*, 405 F.3d at 1208.

At Pensacola, Florida, this 31st day of October 2019.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> A copy of objections must be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**